# Authority to Permit Part-Time Employees to Work Regularly Scheduled Workweeks of 33 to 39 Hours

The statutes governing federal employment permit federal agencies to schedule part-time employees to work regularly scheduled workweeks of 33 to 39 hours.

The Federal Employees Part-Time Career Employment Act of 1978 does not limit agencies' preexisting authority to schedule part-time employees to work any number of hours per week less than 40.

December 31, 2015

MEMORANDUM OPINION FOR THE PRINCIPAL DEPUTY ASSISTANT
ATTORNEY GENERAL, CIVIL RIGHTS DIVISION

The Civil Rights Division ("CRT") has asked whether federal agencies may permit their part-time employees to work regularly scheduled workweeks of 33 to 39 hours.[1] In CRT's view, such arrangements are lawful because the statutes governing federal employment grant agencies broad authority to set their employees' schedules and no statute prohibits part-time schedules of 33 to 39 hours per week.[2] The Office of Personnel Management ("OPM") disagrees. It observes that the Federal Employees Part-Time Career Employment Act of 1978, Pub. L. No. 95-437, 92 Stat. 1055 (codified as amended at 5 U.S.C. §§ 3401 *et seq.*) (the "Act"), defines "part-time career employment" for purposes of the Act as "part-time employment of 16 to 32 hours a week." 5 U.S.C. § 3401(2). OPM argues that this provision sets forth the exclusive definition of part-time employment in the federal government and, as a result, bars part-time employees from working regular schedules of 33 to 39 hours per week.[3]

---

[1] *See* Memorandum for Virginia Seitz, Assistant Attorney General, Office of Legal Counsel, from Jocelyn Samuels, Acting Assistant Attorney General, CRT, *Re: Request for Legal Opinion* (Nov. 6, 2013) ("CRT Memorandum").

[2] *See id.*; Memorandum for Karl Thompson, Acting Assistant Attorney General, Office of Legal Counsel, from Office of Employment Counsel, CRT, *Re: Response to OPM Comments on Whether Agencies May Permit Employees to Work Part-Time Schedules of 33 to 39 Hours Per Week* (Mar. 25, 2014) ("CRT Reply").

[3] *See* Memorandum for Virginia Seitz, Assistant Attorney General, Office of Legal Counsel, from R. Alan Miller, Associate General Counsel, OPM, *Re: Request for OPM Comments re Issue of Whether Agencies May Permit Employees to Work Part-Time Schedules of 33 to 39 Hours Per Week* (Dec. 31, 2013) ("OPM Memorandum"); E-mail for Leondra R. Kruger, Deputy Assistant Attorney General, Office of Legal Counsel, from Melanie J. Watson, OPM, *Re: Solicitation of views on reduced scheduling issue*, att. (Feb. 18, 2014 11:17 AM) (attachment referred to as "OPM Reply"); E-mail for Brian Boynton, Deputy Assistant Attorney General, Office of Legal Counsel, from Melanie J. Watson, OPM, *Re: OLC Part-Time Government Employment Opinion: Follow-Up Questions* (July 22, 2015 1:50 PM).

We conclude that the statutes governing federal employment permit regular part-time schedules of 33 to 39 hours per week. Before the enactment of the Act in October 1978, federal employment statutes permitted agencies to schedule part-time employees to work any number of hours per week less than 40, and in our view the Act did not alter that authority. The text of the Act does not prohibit any form of part-time employment, and the Act's purpose, structure, legislative history, and statutory context do not provide a basis to infer such a prohibition.

In reaching this conclusion, we do not address whether OPM has authority, independent of the Act, to prohibit agencies from offering part-time employment of more than 32 hours per week or whether agencies may as a policy matter elect to require their components not to offer such employment. Nor do we address what administrative steps, if any, CRT would need to undertake before scheduling part-time employees to work regular schedules of more than 32 hours per week.

## I.

We begin with the relevant statutory and regulatory background: the statutes that governed part-time employment before enactment of the Act in 1978, the provisions of the Act, and subsequent regulatory action relating to the Act.

## A.

For many decades, agencies have been authorized to "employ such number of employees . . . as Congress may appropriate for from year to year." 5 U.S.C. § 3101 (Supp. II 1966); *see* 5 U.S.C. § 43 (1934) ("There is authorized to be employed in each executive department . . . such number of employees . . . as may be appropriated for by Congress from year to year."). Since the enactment of the Federal Employees Pay Act of 1945, Pub. L. No. 79-106, 59 Stat. 295, Congress has required agencies "to establish . . . for all full-time officers and employees . . . a basic administrative workweek of forty hours." *Id.* § 604(a) (codified as amended at 5 U.S.C. § 6101(a)(2)(A)). But Congress has long made clear that agencies are not limited to hiring only full-time employees. It has enacted numerous statutes that set forth rules governing part-time employees who may work less than the standard 40-hour schedule.

One of the first statutes to address part-time federal employment was the 1945 Pay Act itself. In addition to establishing the basic 40-hour workweek, that statute instructed the Director of the Bureau of the Budget to "determine the numbers of full-time employees and man-months of part-time employment, which in his opinion are required" for "the proper and efficient performance" of each agency's authorized functions, and to order agencies to release or terminate "any personnel or employment . . . in excess thereof." *Id.* § 607(b). Hence, at the same time that Congress codified the 40-hour workweek for full-time employees, it also acknowledged the existence of "part-time employment" and permitted agencies to

retain part-time personnel so long as they were not "in excess" of administrative personnel ceilings.

In the decades that followed, Congress enacted additional statutes addressing part-time federal employment. For instance, in 1949, after discovering that "the estimated 10,000 part-time [federal] employees" working regular 5-day schedules were ineligible for sick and annual leave, H.R. Rep. No. 81-655, at 1, 5 (1949), Congress enacted a statute providing that "part-time officers and employees for whom there has been established a regular tour of duty covering not less than five days in any administrative workweek shall . . . be entitled to the benefits pro rata of the annual and sick leave Acts." Act of Oct. 5, 1949, Pub. L. No. 81-316, § 1, 63 Stat. 703, 703 (codified as amended at 5 U.S.C. § 6302(c)). In 1964, Congress enacted the Dual Compensation Act, Pub. L. No. 88-448, 78 Stat. 484 (1964), which provided that federal employees could work in "more than one civilian office"—including more than one "temporary, part-time, or intermittent position"—for up to "an aggregate of forty hours of work in any one calendar week." *Id.* §§ 101(3), 301(a) (codified as amended at 5 U.S.C. §§ 5531(a)(2), 5533(a)); *see* S. Rep. No. 88-935, at 17 (1964) (explaining that this statute would enable "part-time employees" to hold "a combination of part-time positions equaling one full-time position"). In 1971, seeing "no reasonable justification for depriving part-time and intermittent salaried employees of premium pay," S. Rep. No. 92-530, at 1–2 (1971), Congress made overtime pay available for federal employees working "full-time, part-time and intermittent tours of duty." Act of Dec. 15, 1971, Pub. L. No. 92-194, 85 Stat. 648 (codified as amended at 5 U.S.C. § 5542(a)). And in September 1978, Congress enacted the Federal Employees Flexible and Compressed Work Schedules Act of 1978, Pub. L. No. 95-390, 92 Stat. 755, which authorized agencies to conduct three-year experiments "to test a . . . compressed schedule," defined "in the case of a part-time employee" as a "biweekly basic work requirement of less than 80 hours which is scheduled for less than 10 workdays." *Id.* §§ 201(1)(B), 202(a), (d).[4]

The Civil Service Commission—the agency charged with administering the federal personnel laws until the establishment of OPM in 1978—also acknowledged agencies' authority to hire part-time employees. In 1954, for instance, the Commission promulgated regulations defining a "[r]egularly scheduled administrative workweek . . . [f]or part-time employees" to mean "the officially prescribed days and hours within an administrative workweek during which such employees are required to be on duty regularly." 19 Fed. Reg. 7097, 7097 (Nov. 2, 1954).

---

[4] *See also* Act of Sept. 3, 1976, Pub. L. No. 94-397, § 1(a), 90 Stat. 1202, 1202 (codified as amended at 5 U.S.C. § 8344(a)) (prescribing the civil service annuities available to employees working "on a part-time basis"); Classification Act of 1949, Pub. L. No. 81-429, § 202(30), 63 Stat. 954, 956 (codified as amended at 5 U.S.C. § 5102(c)(21)) (exempting some part-time employees from the pay classification system).

And in 1971, the Commission issued a version of its Federal Personnel Manual that defined a "part-time employee" for purposes of administrative personnel ceilings as an employee "who works less than 40 hours a week." Federal Personnel Manual, ch. 312, app. B, § B-2(d) (Apr. 30, 1971).

## B.

In October 1978, Congress enacted the Federal Employees Part-Time Career Employment Act. At that time, Congress was aware that part-time employment existed throughout the federal government. *See* H.R. Rep. No. 95-932, at 2–3 (1978) (noting that "1.9 percent of all nonpostal Federal employees work part time" and listing percentages of employees working part-time in numerous federal agencies); S. Rep. No. 95-1116, at 3–4 (1978) (stating that "2.3 percent of the Federal work force were permanent part-time employees" in 1977). But committees in both houses expressed concern that "[t]he Federal Government ha[d] lagged far behind the private sphere in providing and improving part-time employment opportunities of any type." S. Rep. No. 95-1116, at 3; *see* H.R. Rep. No. 95-932, at 2. "The major obstacle[s] to part-time Federal employment," the committees found, were "agency personnel ceilings set by the Office of Management and Budget," under which a part-time employee occupied one of the limited number of positions allotted to each agency "whether the employee work[ed] two or 39 hours." H.R. Rep. No. 95-932, at 3; *see* S. Rep. No. 95-1116, at 9. As a consequence of this system, the committees concluded, agencies had a tendency "to hire 39 hour per week 'part timers,'" rather than "truly part-time employees," H.R. Rep. No. 95-932, at 4, 7, and "in all likelihood employees falling into th[e] 35- to 39-hour a week category made up the vast majority of the new people hired to work part-time in the past year," S. Rep. No. 95-1116, at 10.

The Act was designed to address these problems. Its stated "purpose" is "to provide increased part-time career employment opportunities throughout the Federal Government." Act § 2(b). It defines the term "part-time career employment" as follows:

> For the purpose of this chapter . . . 'part-time career employment' means part-time employment of 16 to 32 hours a week (or 32 to 64 hours during a biweekly pay period in the case of a flexible or compressed work schedule under subchapter II of chapter 61 of this title) under a schedule consisting of an equal or varied number of hours per day, whether in a position which would be part-time without regard to this section or one established to allow job-sharing or comparable arrangements, but does not include employment on a temporary or intermittent basis.

5 U.S.C. § 3401(2).

To further its stated purpose, the Act requires the head of each agency to "establish and maintain a program for part-time career employment." *Id.* § 3402(a)(1). Such a program must include, among other things, "procedures and criteria to be used in connection with establishing or converting positions for part-time career employment," "annual goals for establishing or converting positions for part-time career employment," and "interim and final deadlines for achieving such goals." *Id.* § 3402(a)(1)(B), (C). The Act also includes several provisions to protect existing employees from any negative consequences of such programs. It prohibits an agency from "abolish[ing] any position occupied by an employee in order to make the duties of such position available to be performed on a part-time career employment basis," *id.* § 3403(a); states that "[a]ny person who is employed on a full-time basis in an agency shall not be required to accept part-time employment as a condition of continued employment," *id.* § 3403(b); and makes its provisions inapplicable to positions for which, "on the date of [the Act's] enactment . . . there is in effect . . . a collective-bargaining agreement which establishes the number of hours of employment a week," *id.* § 3405(a); *see also id.* § 3405(b) (stating that the Act does not apply to certain senior-level positions).

The Act also addresses the application of personnel ceilings to part-time career employees. It provides that "[i]n administering any personnel ceiling applicable to an agency (or unit therein), an employee employed by such agency on a part-time career employment basis shall be counted as a fraction which is determined by dividing 40 hours into the average number of hours of such employee's regularly scheduled workweek." *Id.* § 3404. Thus, rather than counting each part-time employee as one full employee for purposes of an agency's personnel ceiling—the practice that the Act's drafters thought encouraged the hiring of "39 hour per week 'part timers,'" H.R. Rep. No. 95-932, at 4—the Act "mandates the use of a 'full-time equivalent' . . . accounting system" that counts each part-time career employee as a fraction equivalent to the fraction of a full-time workweek he works. S. Rep. No. 95-1116, at 9. A part-time career employee who "work[s] a regularly scheduled workweek of 20 hours," for example, now "count[s] as one-half" of a full-time employee for purposes of an agency's personnel ceiling. *Id.* at 17.

Finally, the Act includes "[m]iscellaneous provisions" concerning retirement, life insurance, and health benefits. H.R. Rep. No. 95-932, at 12; S. Rep. No. 95-1116, at 18. The Act states that the Civil Service Commission (later replaced by OPM) may not exclude an employee who occupies "a position on a part-time career employment basis" from receiving retirement, life insurance, or health benefits. Act § 4(a)–(c)(1) (codified at 5 U.S.C. §§ 8347(g), 8716(b), 8913(b)). It also specifies that government contributions for part-time career employees' health insurance are to be prorated based on the number of hours worked per week. *Id.* § 4(c)(2)(A) (codified as amended at 5 U.S.C. § 8906(b)(3)). Because this proration requirement was a change from the government's prior practice of "contribut[ing] to [a part-time employee's] health benefits the same amount as to

an employee working 40 hours a week," S. Rep. No. 95-1116, at 12, Congress provided that "any employee serving in a position on a part-time career employment basis on the date of the enactment of this Act" would continue to receive full health benefits "for such period as the employee continues to serve without a break in service in that or any other position on such part-time basis," Act § 4(c)(2)(B).

## C.

After the Act's passage, OPM promulgated a set of regulations regarding part-time career employment. *See* 44 Fed. Reg. 57,379 (Oct. 5, 1979). OPM made three statements in the regulations' preamble that are pertinent here. First, OPM concluded that the Act prohibited agencies from "regularly employ[ing]" part-time employees "under schedules of more than 32 hours per week." *Id.* at 57,379. It reasoned that "[a]lthough the major thrust of [the Act] was to expand Federal part-time employment opportunities, Congress also evidenced clear intent to end the practice of employing 'nominal' part-time employees in the 33- to 39-hour-per-week range to skirt personnel ceilings." *Id.* Second, OPM stated that this "prohibition" on part-time employment of more than 32 hours per week did "not apply to employment of part-timers who were already working on a permanent part-time basis before [April 8, 1979] for as long as they continue to work part time." *Id.* Third, OPM concluded that because "Congress did not explicitly evidence intent to end the practice of employing career part-timers for less than 16 hours per week in the same way that 33- to 39-hour-per-week employment was proscribed," agencies could "employ permanent workers under regular schedules of less than 16 hours per week." *Id.* at 57,380; *see also id.* at 57,382 (adding 5 C.F.R. § 340.202(b)).

The Department of Justice's Justice Management Division ("JMD") has also issued an order interpreting the Act. As relevant here, that order states that while "a part-time employee" may work more than 32 hours per week on a temporary basis, "[a] temporary increase in the tour of duty above 32 hours per week is not permitted for more than two consecutive pay periods." Part-Time Career Employment Program, Human Resources Order DOJ 1200.1, ch. 1-8.B.6 (Mar. 26, 2004), *available at* http://www.justice.gov/jmd/hr-order-doj12001-part-1-employment. JMD has informed this Office that it, like OPM, "does not believe there is authority to expand part time schedules to exceed 32 hours on an ongoing basis." E-mail for Leondra R. Kruger, Deputy Assistant Attorney General, Office of Legal Counsel, from Arthur E. Gary, General Counsel, JMD, *Re: Question about part-time employment* (Nov. 25, 2014 6:48 PM).

## II.

Having set forth the relevant background, we now consider the legal question at issue: Does federal law permit agencies to schedule their part-time employees to work regular schedules of 33 to 39 hours per week? We first analyze the scope of agencies' authority to schedule part-time workers before the Act. We then address the effect of the Act on prior law, considering at the outset the standard that governs our inquiry and then evaluating the Act under that standard.

## A.

We begin with the scope of agencies' authority prior to the Act's adoption. Both OPM and CRT assert that before the Act became law, agencies had authority both to hire part-time employees and to schedule them to work 33 to 39 hours per week. *See* OPM Memorandum at 5 ("Prior to enactment of the Act, agencies could employ individuals on a part-time work schedule of 33 to 39 hours per week."); CRT Reply at 1 (similar). We agree that agencies possessed both types of authority.

First, before the Act, agencies possessed authority to *hire* part-time employees. As noted above, for decades Congress had vested agencies with general authority to "employ such number of employees . . . as Congress may appropriate for from year to year," 5 U.S.C. § 3101 (Supp. II 1966); *see* 5 U.S.C. § 43 (1934) (similar), and in numerous statutes between 1945 and October 1978, Congress made clear that the "employees" agencies could hire included part-time employees. For example, Congress permitted agencies to employ "part-time employ[ees]" within limits set by the Director of the Bureau of the Budget, Pub. L. No. 79-106, § 607(b); made "part-time officers and employees" eligible for annual and sick leave, Pub. L. No. 81-316, § 1; permitted employees to work in more than one "part-time . . . position" for up to an aggregate of 40 hours per week, Pub. L. No. 88-448, §§ 101(3), 301(a); extended overtime pay to employees working "part-time . . . tours of duty," Pub. L. No. 92-194; and allowed "part-time employee[s]" to work compressed schedules, Pub. L. No. 95-390, § 201(1)(B). These statutes were premised on the lawfulness of part-time employment across the federal government. *See, e.g.*, H.R. Rep. No. 81-655, at 2 (describing existing part-time employees whom statute would benefit); S. Rep. No. 92-530, at 1–2 (same). It is therefore straightforward to conclude from them that agencies possessed the authority to hire part-time employees. *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2520 (2015) (inferring that "disparate-impact liability exists" under the Fair Housing Act from a series of amendments "that assume the existence of disparate-impact claims"); *Bilski v. Kappos*, 561 U.S. 593, 607 (2010) (inferring that business methods are patentable from provisions that "explicitly contemplate[] the existence of at least some

business method patents" and that would be "render[ed] . . . meaningless" if those patents were unlawful).

Congress again recognized agencies' preexisting authority to hire part-time employees when it enacted the Act. Several of the Act's provisions refer to or acknowledge part-time employees hired prior to the Act's enactment. *See* Act § 4(c)(2)(B) (grandfathering health benefits for "any employee serving in a position on a part-time career employment basis on the date of the enactment of this Act"); *id.* § 2(b) (stating that the Act's purpose is "to provide *increased* part-time career employment opportunities throughout the Federal Government" (emphasis added)); 5 U.S.C. § 3401(2) (referring to "position[s] which would be part-time without regard to this section"). Moreover, Congress's central concern in enacting the Act was that agencies were hiring too few part-time employees. *See* S. Rep. No. 95-1116, at 3–4, 8–10; H.R. Rep. No. 95-932, at 2–3, 8. Nothing in the Act's legislative history reveals any doubt about agencies' authority to hire part-time employees in the first place.

Second, prior to the Act, agencies also possessed authority to *schedule* part-time employees to work any number of hours per week below 40. For full-time employees, Congress set "a basic administrative workweek of 40 hours." 5 U.S.C. § 6101(a)(2)(A) (1976). But Congress did not set a specific number of hours that part-time employees were required to work. By implication, agencies could not schedule part-time employees to work a full-time schedule of 40 hours per week. *See* Webster's Third New International Dictionary 1648 (1976) (defining "part-time" to mean "employed for or working less than the amount of time considered customary or standard"). Otherwise, however, agencies had unrestricted authority to schedule part-time employees to work any number of hours per week below 40—including, if they chose, 33 to 39 hours. *See* 5 U.S.C. § 6101(b)(1) (Supp. II 1966) (recognizing the authority of agency heads to set employee schedules); 5 C.F.R. § 25.203(a)(2) (1961) (defining the "'[r]egularly scheduled administrative workweek' . . . [f]or part-time employees" as "the officially prescribed days and hours within an administrative workweek during which such employees are required to be on duty regularly"); Federal Personnel Manual, ch. 312, app. B, § B-2(d) (Apr. 30, 1971) (defining a "part-time employee" as one "who works less than 40 hours a week"); *see also* Pub. L. No. 95-390, § 201(1)(B) (defining a compressed schedule for part-time employees as a "biweekly basic work require-ment of *less than 80 hours* which is scheduled for less than 10 workdays" (emphasis added)).

Congress has not repealed any of the major enactments discussed above. Except for the provision of the 1945 Pay Act regarding personnel ceilings, all of the statutes and regulations concerning part-time employment or granting agencies employment or scheduling authority remain in effect. *See* 5 U.S.C. § 3101 (2012 & Supp. II 2014) (employment authority); *id.* §§ 5531(2), 5533(a) (dual compen-sation); *id.* § 5542(a) (premium pay); *id.* § 6101(a)(3) (scheduling authority); *id.* § 6121(5)(B) (compressed schedules); *id.* § 6302(c) (annual and sick leave); 5

C.F.R. § 610.102 (2015) (part-time workweek); *see also* Act of Sept. 12, 1950, Pub. L. No. 81-784, § 301(85), 64 Stat. 832, 843 (repealing statutory personnel ceilings). Hence, unless Congress has enacted a statute limiting that authority, agencies may continue to schedule part-time employees to work 33 to 39 hours per week.

### B.

We now consider the effect of the Federal Employees Part-Time Career Employment Act on the prior law governing part-time employment. In order to do so, we must first identify the standard that will control our analysis. CRT and OPM suggest different governing standards in support of their respective constructions of the Act.

On one hand, CRT argues that the Act should not be construed to diminish agencies' authority to set part-time work schedules unless it *clearly* states that it was intended to have that effect. *See* CRT Memorandum at 4. CRT relies on the principle that "'[r]epeals by implication . . . will not be found unless an intent to repeal is clear and manifest.'" *Id.* (quoting *Rodriguez v. United States*, 480 U.S. 522, 524 (1987) (per curiam)); *see United States v. Fausto*, 484 U.S. 439, 453 (1988) (stating that "it can be strongly presumed that Congress will specifically address language on the statute books that it wishes to change"). CRT contends that any limitation of agencies' scheduling authority would amount to a partial repeal of chapter 61 of title 5 of the United States Code—the chapter granting agencies general scheduling authority—and that the Act should therefore be presumed not to impose such a limitation. CRT Memorandum at 4; *see* CRT Reply at 1–2.

We do not agree that the presumption against implied repeals applies here. Chapter 61 of title 5 does not *expressly* state that agencies have authority to schedule part-time employees to work any number of hours per week below 40. Rather, as relevant, it provides that the basic administrative workweek for full-time employees is 40 hours, *see* 5 U.S.C. § 6101(a)(2)(A), and suggests that agencies have authority to set different schedules for employees who are not full time, *see, e.g.*, *id.* § 6101(a)(3)(A) (requiring agencies to "provide, with respect to each employee . . . that assignments to tours of duty are scheduled in advance"). As discussed above, it is a fair implication that, in the absence of any other limit, agencies may schedule part-time employees to work up to 39 hours per week. But a statute "does not stand repealed" whenever its "implications . . . may be altered by the implications of a later statute." *Fausto*, 484 U.S. at 453. A repeal occurs—and thus the presumption against repeals by implication is applicable—only where a subsequent statute contradicts "express statutory text," not "a legal disposition implied by a statutory text." *Id.* Consequently, we do not believe that the Act must contain a clear statement in order to limit agencies' preexisting authority to schedule part-time employees.

OPM, on the other hand, contends that its 1979 regulations interpreting the Act to bar part-time schedules of more than 32 hours per week "merit deference." OPM Memorandum at 6. We presume that OPM is referring to the type of deference described in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which held that courts should defer to an "an agency's construction of the statute which it administers" where "the statute is silent or ambiguous with respect to the specific issue" under review and the agency's construction is "permissible." *Id.* at 842–43. *Chevron* deference, however, is inapplicable in this context. Courts have held that agencies are not entitled to *Chevron* deference when interpreting "generic statutes that apply to dozens of agencies." *Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246, 1252 (D.C. Cir. 2003); *see Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 642 n.30 (1986) (explaining that "the same basis for deference predicated on expertise" was not present where an agency was interpreting a statute under which "[t]wenty-seven agencies . . . ha[d] promulgated regulations"); *Proffitt v. FDIC*, 200 F.3d 855, 860 (D.C. Cir. 2000) (declining to grant *Chevron* deference to an agency's interpretation of a "statute of general applicability" (internal quotation marks omitted)); *Salleh v. Christopher*, 85 F.3d 689, 692 (D.C. Cir. 1996) (noting line of decisions "that have declined to defer to an agency's interpretation of a statute when more than one agency is granted authority to interpret the same statute"); *cf. Proposed Agency Interpretation of "Federal Means-Tested Public Benefit[s]" Under Personal Responsibility and Work Opportunity Reconciliation Act of 1996*, 21 Op. O.L.C. 21, 34–35 (1997) (distinguishing situation in which "a statute assigns a group of agencies a particular task that is related to the duties that the agencies already have been assigned by their governing statutes" and "the agencies . . . concur in their interpretation" of that statute). Here, numerous agencies administer, and are required to promulgate regulations implementing, the Act. *See* 5 U.S.C. § 3402(a)(1) (requiring "the head of each agency, by regulation, [to] establish and maintain a program for part-time career employment within such agency"). OPM's authority under the Act is limited to "advis[ing] and assist[ing]" agencies in developing their own implementing regulations and conducting a "research and demonstration program with respect to part-time career employment." *Id.* § 3402(b)(1)–(2). Hence, although OPM's views concerning the Act merit respect and careful consideration, we do not believe they are entitled to *Chevron* deference.[5]

Because neither the presumption against implied repeals nor *Chevron* deference applies, our role is to identify the best reading of the Act using standard tools of

---

[5] Even if *Chevron* deference were applicable, the first step in the analysis would be to determine whether the Act is ambiguous using "traditional tools of statutory construction." *Chevron*, 467 U.S. at 843 n.9. Applying those tools here, we do not believe the Act is ambiguous for the reasons set forth below.

statutory construction. *See, e.g.*, *Reimbursing Transition-Related Expenses Incurred Before the Administrator of General Services Ascertained Who Were the Apparent Successful Candidates for the Offices of President and Vice President*, 25 Op. O.L.C. 7, 8 (2001) (endeavoring to identify "the best reading of the statute").

## C.

There appear to be two possible ways to interpret the Act. The first possible interpretation is that the Act encourages agencies to schedule part-time employees to work 16 to 32 hours per week but does not prohibit agencies from setting part-time schedules outside that range. CRT favors this reading. *See* CRT Memorandum at 2–3. The second possible interpretation is that the Act not only encourages "part-time career employment" but also redefines part-time employment to include only employment of 16 to 32 hours per week. OPM favors this reading. *See* OPM Memorandum at 1; 44 Fed. Reg. at 57,379. In the following sections, we examine in turn the Act's text, purpose, structure, history, and context to determine which of these competing interpretations is the better reading of the Act.

## 1.

"'[W]e start, of course, with the statutory text.'" *Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013) (quoting *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006)). As noted above, the Act defines part-time career employment "[f]or the purpose of th[e] chapter" in which it appears as "part-time employment of 16 to 32 hours a week." 5 U.S.C. § 3401(2). It then provides that, "in order to promote part-time career employment opportunities in all grade levels," each agency "shall establish and maintain a program for part-time career employment," which must include "procedures and criteria" and "annual goals" for "establishing or converting positions for part-time career employment," as well as "interim and final deadlines for achieving such goals." *Id.* § 3402(a)(1)(B), (C). The Act also specifies that "[i]n administering any personnel ceiling," a part-time career employee "shall be counted as a fraction" equivalent to the fraction of the full workweek she works. *Id.* § 3404. Additionally, the Act entitles part-time career employees to full retirement and life insurance benefits and to health benefits prorated to the portion of the full workweek they work. Act § 4.

On its face, the Act thus defines a particular type of part-time employment— "part-time career employment"—and establishes programs and requirements to encourage it. The Act does not state that all part-time employment must satisfy its definition of part-time career employment. Nor does the Act say that any particular form of part-time employment is prohibited or limit the number of hours that employees other than "part-time career employees" may work. It simply leaves all part-time employment except part-time career employment unaddressed.

OPM contends that the Act's definition of part-time career employment "redefine[s] the specific hours which constitute part-time employment" to include only "work schedules of 16 to 32 hours per week." OPM Memorandum at 2; *see* 44 Fed. Reg. at 57,379 (stating that the Act "narrows the definition of part-time career employment in the Federal Government from scheduled work of less than 40 hours per week to scheduled work between 16 and 32 hours per week"). That interpretation, however, is difficult to reconcile with the plain text of the definition. The Act defines only the specific term "part-time career employment," not part-time employment generally. 5 U.S.C. § 3401(2). And it defines that term only "[f]or the purpose of this chapter"—i.e., chapter 34 of title 5, which consists exclusively of the Act itself. *Id.* It is unclear why Congress would have limited the definition in these ways if its intention was to redefine part-time employment more broadly. Moreover, numerous courts have expressly declined to "apply a definition from one statutory provision to another" where it is defined only "for purposes of" a particular provision, even if that provision offers "the only definition of [the defined term] in the [U.S.] Code." *United States v. Mazza-Alaluf*, 621 F.3d 205, 209–210 (2d Cir. 2010); *see, e.g.*, *United States v. Ervin*, 601 F. App'x 793, 799 (11th Cir. 2015) (per curiam); *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 733 (9th Cir. 2007); *United States v. Savin*, 349 F.3d 27, 36 (2d Cir. 2003); *Sierra Club v. EPA*, 325 F.3d 374, 383 (D.C. Cir. 2003); *Cunningham v. Scibana*, 259 F.3d 303, 308 n.2 (4th Cir. 2001); *United States v. Levario-Quiroz*, 161 F.3d 903, 908 (5th Cir. 1998); *Moldovan v. Great Atl. & Pac. Tea Co.*, 790 F.2d 894, 901 (3d Cir. 1986).

Hence, the plain text of the Act does not limit agencies' preexisting authority to schedule part-time employees to work any number of hours per week below 40 or redefine "part-time" employment as that term is used throughout the laws governing federal employment. *E.g.*, 5 U.S.C. §§ 5531(2), 5542(a), 6121(5)(B), 6302(c). That is a strong indication that the Act does not prohibit part-time employment that falls outside the Act's definition. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2003) ("It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." (internal quotation marks omitted)).

## 2.

We next consider the purpose of the Act. The statute addresses this subject directly: The Act states that its "purpose . . . is to provide increased part-time career employment opportunities throughout the Federal Government." Act § 2(b). The Act reiterates this objective in its core provision, instructing agencies to establish part-time career employment programs "[i]n order to promote part-time career employment opportunities in all grade levels." 5 U.S.C. § 3402(a)(1). These statements of purpose indicate that the Act is designed to "provide increased . . .

opportunities" for and "promote" part-time career employment, principally through the requirement that agencies establish part-time career employment programs. They do not contain any suggestion that Congress intended to prohibit alternative forms of part-time employment. Nor does the Act contain any other expressions of purpose that might arguably support such a reading. The Act's stated purpose, therefore, also supports the first possible interpretation of the statute.

### 3.

We also consider the structure of the Act. As discussed above, the Act requires each agency to "establish and maintain a program for part-time career employment," 5 U.S.C. § 3402(a)(1); provides that each part-time career employee "shall be counted as a fraction" of a full-time employee for purposes of federal personnel ceilings, *id.* § 3404; and specifies the retirement, life insurance, and health benefits to which part-time career employees are entitled, Act § 4.

The principal provisions of the Act—the requirement that agencies establish part-time career employment programs and the new approach to counting part-time employees covered by the Act—work just as Congress intended under either possible interpretation of the Act. Regardless of whether the Act is read to allow part-time employment that falls outside the Act's definition of part-time career employment, each agency has the same legal duty to "establish and maintain a program for part-time career employment," 5 U.S.C. § 3402(a)(1), thereby ensuring that agencies provide "increased part-time career employment opportunities," Act § 2(b). Similarly, no matter whether agencies may hire part-time employees outside the Act, the provision of the Act addressing agency personnel ceilings eliminates any incentive to favor part-time employees who work nearly 40 hours per week over part-time employees covered by the Act in order to "skirt personnel ceilings." H.R. Rep. No. 95-932, at 7; *see* 5 U.S.C. § 3404.

OPM contends that support for its interpretation can be found in the structure of the Act's provisions concerning the benefits available to part-time career employees. *See* OPM Memorandum at 3–6. In considering these provisions, we must be mindful that Congress typically "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 458, 468 (2001). A prohibition on part-time employment of less than 16 or more than 32 hours per week would constitute an important feature of the Act and a significant limitation on agencies' scheduling authority. In contrast, the Act's "[m]iscellaneous provisions" concerning benefits, H.R. Rep. No. 95-932, at 12; S. Rep. No. 95-1116, at 18, are ancillary features of the statute that do not purport to address the authority of agencies to permit different kinds of part-time schedules. It is therefore unlikely that, had Congress intended to prohibit part-time employment other than part-time career employment as defined in the Act, it would have

done so—only by implication—in this part of the Act. With that admonition in mind, we consider the Act's provisions regarding retirement, life insurance, and health benefits.

a. The Act first addresses retirement benefits. Before the Act became law, 5 U.S.C. § 8347(g) stated that the Civil Service Commission "may exclude from [retirement benefits] an employee or group of employees in or under an Executive agency whose employment is temporary or intermittent." 5 U.S.C. § 8347(g) (1976). The Act amended this subsection by adding a sentence stating that the Commission (now OPM) "may not exclude any employee who occupies a position on a part-time career employment basis." Act § 4(a).

OPM contends that this amendment "demonstrates congressional intent to address benefits coverage for all part-time employees." OPM Memorandum at 5 n.2. It is not clear, however, why that is so. The amendment simply "ensure[s] that employees employed under a part-time career employment program may not be excluded from civil service retirement coverage." H.R. Rep. No. 95-932, at 12; *see* S. Rep. No. 95-1116, at 18 (same). The amendment is thus entirely consistent with the view that the Act seeks to encourage part-time career employment—in this case, by extending part-time career employees a special guarantee of retirement benefits—without necessarily prohibiting alternative forms of part-time employment. Several other provisions of the Act similarly favor part-time career employees, including the requirement that agencies establish programs exclusively to promote part-time career employment, 5 U.S.C. § 3402(a)(1), the provision altering the way only part-time career employees are counted for purposes of personnel ceilings, *id.* § 3404, and the Act's stated purpose of "provid[ing] increased part-time career employment opportunities," Act § 2(b).[6]

b. The Act's second benefits provision addresses life insurance. Prior to the Act, 5 U.S.C. § 8716(b) stated that the Civil Service Commission "may exclude an employee" from receiving life insurance benefits "on the basis of the nature and type of his employment or conditions pertaining to it, such as short-term appointment, seasonal, intermittent *or part-time* employment, and employment of like nature." 5 U.S.C. § 8716(b) (1976) (emphasis added). In the Act, Congress amended this provision by striking "part-time" and adding a new paragraph stating that the Commission (now OPM) may not exclude "an employee who is occupying a position on a part-time career employment basis" from receiving life insurance benefits. Act § 4(b).

---

[6] Moreover, the effect of this amendment was quite limited. The Act expressly provides that part-time career employment "does not include employment on a temporary or intermittent basis." 5 U.S.C. § 3401(2). As a result, there was no need for Congress to except part-time career employment from 5 U.S.C. § 8347(g), which permitted the exclusion from retirement benefits of only "temporary or intermittent" employees. *See* H.R. Rep. No. 95-932, at 12 (acknowledging this point); S. Rep. No. 95-1116, at 18 (same). Similarly, there was no need to clarify that OPM could not exclude other part-time employment that is not temporary or intermittent.

OPM argues that this provision supports its interpretation of the Act in two ways. First, OPM contends that it would have been illogical for Congress to prevent it from excluding part-time career employees from life insurance coverage without granting a similar protection to other part-time employees. OPM Memorandum at 5. But as we have just explained, the Act was intended to increase part-time career employment, and it favors that type of employment in a number of different ways. It therefore would be neither surprising nor irrational if Congress favored part-time career employees by granting them a special entitlement to life insurance benefits that it did not extend to other part-time employees.

Second, OPM argues that there would have been no reason for Congress to delete "part-time" from section 8716(b) if agencies could still employ (and thus still exclude from life insurance coverage) part-time employees who were not part-time career employees. OPM Memorandum at 5. Although it is not entirely clear why Congress amended section 8716(b) in the manner it did, there is at least one plausible reason why Congress might have removed the reference to "part-time" employment in section 8716(b) even if agencies could continue to employ part-time employees not covered by the Act. Removing this phrase eliminated any inconsistency between the statement that OPM "may not exclude . . . part-time career employ[ees]" and the statement that it "may exclude . . . part-time employ[ees]," a broader category that seemingly would include part-time career employees. At the same time, this amendment continued to permit OPM to exclude employees from life insurance benefits "on the basis of the nature and type of [their] employment," thus allowing the agency to deny benefits to part-time employees not covered by the Act (since theirs is a "type" of employment). 5 U.S.C. § 8716(b) (2012); *cf.* 5 C.F.R. § 870.302(b)(4)–(8) (2015) (relying on this provision to exclude employees paid "$12 a year or less," employees paid on a "contract or fee basis," "Senate restaurant employee[s]," and other such categories from life insurance benefits). Of course, Congress could have accomplished this result in other ways, such as by permitting OPM to exclude an employee from life insurance benefits on the basis of "part-time employment *other than part-time career employment*." But the fact that "Congress could have accomplished the same result by phrasing the statute differently" does not provide a basis for reading unstated limitations into its text. *United States v. Aguilar*, 515 U.S. 593, 604 (1995).

c. The Act's third benefits provision concerns health insurance. Much like the retirement and life insurance provisions, this provision begins by clarifying that OPM may not exclude "an employee who is occupying a position on a part-time career employment basis" from receiving health benefits. Act § 4(c)(1) (codified at 5 U.S.C. § 8913(b)(3)). OPM contends that this amendment "demonstrates congressional intent to address benefits coverage for all part-time employees." OPM Memorandum at 5 n.2. For the same reasons we have just given, however, we do not agree. Congress may have intended to grant part-time career employees

a protection to which other part-time employees are not entitled, a goal that would be fully consistent with the purpose and structure of the statute.

The health insurance benefits provision goes on to provide that employees "occupying a position on a part-time career employment basis" shall receive health benefits in an amount prorated to the proportion of the full workweek that they work. Act § 4(c)(2)(A). OPM makes a stronger argument based on this portion of the provision. Neither the Act nor any other statute similarly prorates health benefits for other part-time employees. OPM thus argues that the Act would result in an anomaly if agencies could employ part-time employees outside of the Act's definition of part-time career employment: Whereas part-time career employees would receive prorated health benefits, other part-time employees would be eligible for either full health benefits or no health benefits at all. OPM Memorandum at 3 & n.1. OPM asserts that this system would be inconsistent with Congress's goal of "providing appropriate benefits to part-time employees" and of "limiting Government obligations commensurate with the number of hours in the reduced work schedule of part-time employees." *Id.* at 3.

We acknowledge that it would seem somewhat anomalous for Congress to have prorated health benefits for employees in the part-time career employment program it was trying to promote while failing to do so for other part-time employees. But the Supreme Court has cautioned that it "does not revise legislation . . . just because the text as written creates an apparent anomaly as to some subject it does not address." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2033 (2014). And here, the anomaly OPM identifies is neither particularly serious nor inexplicable. Congress has allowed a similar anomaly to exist in other circumstances by declining to prorate health benefits for seasonal, intermittent, and short-term workers and thus putting OPM to the same choice of offering those less-than-full-time employees either full health benefits or no benefits at all. *See* 5 U.S.C. § 8906(b) (prescribing the health benefits to which eligible employees are entitled); *id.* § 8913(b) (permitting OPM to exclude such employees from health benefits). Moreover, the legislative history indicates that Congress prorated health benefits for part-time career employees for a reason that was inapplicable to other part-time employees. The version of the Act initially passed by the House would have granted full health benefits to part-time career employees. *See* H.R. 10126, 95th Cong. § 4(c) (as passed by House, Mar. 13, 1978). The relevant Senate committee, however, observed that these benefits "comprised the major part of the price tag for the House-passed bill" and expressed concern that "the public [would] accept" the Act only if it held "the cost of government constant." S. Rep. No. 95-1116, at 12. The Senate therefore amended the bill to provide that health benefits for part-time career employees "would be prorated according to the number of hours worked." *Id.*; *see* S. 518, 95th Cong. § 4(c)(2)(A) (as passed by Senate, Aug. 25, 1978); *see also* 124 Cong. Rec. 30,968 (1978) (statement of Rep. Schroeder) (House sponsor of the Act stating that she agreed with the Senate amendment because it "would save money"). This history suggests that Congress

did not enact the proration provision to establish a general principle that government obligations should be "commensurate with the number of hours" worked, as OPM contends. OPM Memorandum at 3. Rather, it enacted the proration provision as part of a compromise designed to ensure that the Act would win public acceptance.[7]

The health insurance benefits provision of the Act also states that the Act's proration of health benefits does not apply to "any employee serving in a position on a part-time career employment basis on the date of the enactment of this Act." Act § 4(c)(2)(B). OPM contends that this provision shows that Congress "intended to bring *all* types of part-time employment under [the Act's] coverage" because it indicates that employees hired prior to the date of the Act's enactment can qualify as part-time career employees. OPM Memorandum at 4 (emphasis added). We do not think that follows. The fact that part-time employees hired before the Act can fall within the Act's definition of "part-time employment" provides no basis to conclude that Congress foreclosed part-time employment outside that definition. Nor is it relevant that the provision applies only to part-time career employees. The Act did not alter health benefits for part-time employees who fall outside the Act's definition, so there was no need to grandfather benefits for such employees.

In sum, the Act's principal provisions would work as Congress intended under either possible reading of the Act, and the Act's miscellaneous benefits provisions do not provide any strong indication that Congress intended to foreclose all part-time employment not covered by the Act. The Act's structure is thus consistent with either possible interpretation of the statute.

**4.**

We turn next to the legislative history of the Act generally. Both the House and Senate committee reports open by stating that "[t]he purpose of [the Act] is to encourage the use of part-time career employment in the Federal government by requiring each agency to establish a program to provide for increased part-time career employment opportunities." S. Rep. No. 95-1116, at 1; H.R. Rep. No. 95-932, at 1. Similarly, each committee report discusses at length the concern that federal agencies "lagged far behind the private sphere in providing and improving

---

[7] In its estimate of the bill's costs, the Senate report does not contemplate any savings to the government from the elimination of part-time employees who fall outside the Act. *See* S. Rep. No. 95-1116, at 19–21. If the second reading of the Act were correct, then the Senate bill would have resulted in substantial financial savings to the government by eliminating its obligation to pay full health benefits to existing part-time employees working fewer than 16 or more than 32 hours per week. The drafters' failure to consider that possibility—notwithstanding their close attention to other ways the Act might generate financial savings, *see id.* at 20 (identifying possible savings resulting from reduced enrollment in health plans by part-time career employees)—suggests that the drafters did not believe that the Act would prohibit part-time employment not covered by the Act.

part-time employment opportunities." S. Rep. No. 95-1116, at 3; *see id.* at 3–12 (discussing the scope of this problem); H.R. Rep. No. 95-932, at 2–5, 8 (similar). These discussions are consistent with the Act's statements that its purpose is to "provide increased opportunities for" and "promote" part-time career employment. Act § 2(b); 5 U.S.C. § 3402(a)(1). And they tend to support the view that Congress intended to encourage part-time career employment but not prohibit alternative forms of part-time employment.

OPM identifies two passages from the House and Senate reports that it contends support the conclusion that Congress intended to redefine part-time employment to include only employment of 16 to 32 hours per week. *See* OPM Memorandum at 2–3. The first passage OPM identifies appears in the House report. In explaining the Act's definition of part-time career employment, that report says:

> This legislation defines "part-time career employment" as employment of 16 to 32 hours per week, and does not include temporary or intermittent employment. Its aim is to encourage the hiring of truly part-time employees, in contrast to the current practice of suing [sic] employees working up to 39 hours per week to skirt personnel ceilings.

H.R. Rep. No. 95-932, at 7. OPM argues that this passage shows that the Act's drafters "inten[ded] that part-time employment be limited to hours substantially less than 40 hours per week." OPM Memorandum at 2. Although that inference is plausible, it is not the only possible reading of the relevant language. The passage says that the Act aims to "*encourage* the hiring of truly part-time employees." H.R. Rep. No. 95-932, at 7 (emphasis added). Even if the drafters believed that employees who do not work 16 to 32 hours per week are not "truly part-time," the passage states that the drafters' method of promoting "part-time career employment" under the Act was by encouragement, not mandate. Moreover, the passage specifically disapproves of the use of "employees working up to 39 hours per week *to skirt personnel ceilings*," *id.* (emphasis added), and under any interpretation, the Act eliminates the incentive to engage in that practice by changing the manner in which part-time career employees are counted for purposes of personnel ceilings, *see* 5 U.S.C. § 3404; S. Rep. No. 95-1116, at 16–17.

The second passage OPM cites appears in a section of the Senate report discussing the definition of part-time career employment contained in the Senate's version of the Act. The passage begins by explaining that the Senate bill "defines the term[] . . . 'part-time career employment' for the purposes of new subchapter VIII . . . to mean part-time employment of 10 hours, 20 hours, and 30 hours a week." S. Rep. No. 95-1116, at 13. It goes on to acknowledge that this "approach to the definition of part-time career employment differs from the approach taken in the House." *Id.* at 14. The passage then states:

> The administration contends that part-time employment should be defined as anything less than 40 hours per week. The committee disagrees because such a definition would make possible the current arrangement by which those individuals defined as working part-time for the Federal Government include many working 35 to 39 hours per week. In order for the legislation to have an impact, the committee shares the view of the House that part-time employment must be defined so that the jobs created entail significantly less than 40 hours of work per week.

*Id.*

OPM contends that this passage shows that Congress intended to "limit[] part-time employment" to "work schedule[s] [of] significantly less than 40 hours." OPM Memorandum at 3. That reading is reasonable; it draws support from the drafters' statement of disapproval of the "arrangement by which those individuals defined as working part-time for the Federal Government include many working 35 to 39 hours per week," and their reference to the definition of "part-time employment," rather than "part-time *career* employment," S. Rep. No. 95-1116, at 14. But it is also reasonable to read this passage as stating that the drafters intended the Act to encourage only part-time employment falling within the Act's definition of part-time career employment. In support of this reading, the passage says that the drafters intended to ensure that "*the jobs created* entail significantly less than 40 hours of work per week," *id.* (emphasis added)—a goal the Act achieves by limiting the Act's definition of "part-time career employment" to employees working between 16 and 32 hours per week and requiring each agency to "establish and maintain a program for part-time career employment," 5 U.S.C. § 3402(a)(1). Moreover, the passage's reference to "part-time employment" may simply have been an imprecise shorthand for "part-time career employment." The drafters used the same shorthand elsewhere in the Senate report, even where they clearly intended to refer only to part-time career employment; for instance, in two places the report states that the Act entitles "current personnel *working part-time*" to receive full health benefits, S. Rep. No. 95-1116, at 12 (emphasis added); *see id.* at 2 (similar), even though the Act grants that entitlement only to personnel working "on a part-time *career employment* basis on the date of the enactment of this Act," Act § 4(c)(2)(B) (emphasis added), and the drafters were well aware that "many" part-time employees employed on the date of the Act's enactment were not part-time career employees, S. Rep. No. 95-1116, at 14. In addition, the relevant passage opens by referring to the manner in which the Act "defines the term[] . . . 'part-time career employment' for the purposes of new subchapter VIII," and goes on to refer to the Act's "definition of part-time career employment." *Id.* at 13–14.

As a result, we conclude that the legislative history of the Act is ambiguous with respect to the question at hand. Some statements in the House and Senate

reports support the first possible interpretation of the Act, while others might (but need not) be read to support the second interpretation. Because "the authoritative statement" of a statute's meaning is "the statutory text, not the legislative history," this equivocal evidence of congressional intent bears little weight in construing the Act. *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005); *see Milner v. Dep't of Navy*, 562 U.S. 562, 572 (2011) ("We will not . . . allow[] ambiguous legislative history to muddy clear statutory language.").

**5.**

Finally, we examine the context in which the Act was drafted and its "place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 132 S. Ct. 1350, 1357 (2012) (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)).

a. We begin by considering the Act's effect on part-time employment arrangements that existed at the time of its enactment. The first possible interpretation of the Act would not appear to have any significant adverse effects on preexisting part-time employment arrangements. Under that interpretation, agencies would retain their authority to schedule part-time employees as they see fit, and there would be no disruptive or improbable effects on preexisting employees.

The second interpretation of the Act, in contrast, would lead to two unlikely and disruptive consequences, which themselves could be avoided only by significantly straining the Act's text. First, if the Act prohibited all part-time employment falling outside of its definition, then the Act seemingly would have made it unlawful for agencies to continue to employ part-time employees already working more than 32 hours per week. Congress was aware that agencies employed numerous such employees when the Act was enacted. *See* S. Rep. No. 95-1116, at 10 (stating that "the vast majority" of new part-time employees worked between 35 and 39 hours per week); H.R. Rep. No. 95-932, at 4 (stating that "the tendency is to hire 39 hour per week 'part timers'"). Yet nothing in the text or history of the Act indicates that Congress contemplated that agencies would need to terminate or reschedule all of those employees—an omission that is particularly notable given that Congress showed solicitude for other employees potentially affected by the Act's provisions. *See* 5 U.S.C. § 3403(a) (prohibiting agencies from abolishing positions to make them available to part-time career employees); *id.* § 3403(b) (prohibiting agencies from requiring full-time employees to accept part-time employment); Act § 4(c)(2)(B) (grandfathering health benefits for preexisting part-time career employees). Congress's silence on this subject strongly suggests that Congress did not intend to proscribe part-time employment not within the Act's definition. *Cf. Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991) ("Congress' silence in this regard can be likened to the dog that did not bark.").

OPM attempted to mitigate this severe consequence of its interpretation when it promulgated regulations concerning the Act in 1979. In the preamble to those regulations, OPM—applying its understanding of the Act—asserted that the Act's "prohibition" on the employment of part-time employees working 33 to 39 hours per week "d[id] not apply" to anyone employed prior to April 8, 1979. 44 Fed. Reg. at 57,379. But OPM did not cite any statutory basis for this assertion, and we have identified none.

Second, if the Act offered the exclusive definition of part-time employment for federal employees, then the statute would prohibit not only part-time employment of more than 32 hours per week, but also part-time employment of less than "16 . . . hours a week." 5 U.S.C. § 3401(2). Yet as OPM observed, there is no evidence—even in the legislative history—that Congress "inten[ded] to end the practice of employing" part-time employees who work 1 to 15 hours per week. 44 Fed. Reg. at 57,380. Accordingly, OPM promulgated a regulation stating that agencies could continue to permit schedules of 1 to 15 hours per week "under the authority provided in 5 U.S.C. 3402(a)(3)." 5 C.F.R. § 340.202(b). But this exception too lacks a firm basis in the Act's text. Section 3402(a)(3) provides that "[r]egulations established under" section 3402(a)(1) "may provide for such exceptions as may be necessary to carry out the mission of the agency." 5 U.S.C. § 3402(a)(3). The "[r]egulations established under" section 3402(a)(1), however, are ones that "establish and maintain a program for part-time career employment" by setting various procedures for establishing, reviewing, and setting goals and timetables for the creation of part-time career employment positions. *Id.* § 3402(a)(1). Section 3402(a)(3) thus appears to permit exceptions only to the various procedures that constitute an agency's part-time career employment program. *See* S. Rep. No. 95-1116, at 15 ("Paragraph (3) provides that agency regulations establishing part-time career employment programs may provide for such exceptions *to such programs* as may be necessary to carry out the mission of the agency." (emphasis added)); H.R. Rep. No. 95-932, at 10 (same). It is doubtful that an exception altering the definition of "part-time career employment" falls within that authority.[8] OPM's interpretation of the Act would therefore either compel a result that Congress apparently did not intend (elimination of part-time schedules of fewer than 16 hours per week) or require a significant expansion of the Act's text to avoid that result.

b. We next consider three potentially relevant statutes enacted subsequent to the Act. First, as discussed above, a few weeks before the Act's passage, Congress enacted a statute establishing a three-year experimental program "to test . . . compressed schedule[s]" that defined a compressed schedule for a "part-time employee" as "a biweekly basic work requirement of less than 80 hours which is

---

[8] As noted above, we do not address whether OPM might have authority under other statutes to limit or expand the scope of part-time employment.

scheduled for less than 10 workdays." Pub. L. No. 95-390, §§ 201(1)(B), 202(a). Three years later, Congress made this program permanent by enacting the Federal Employees Flexible and Compressed Work Schedules Act of 1982, Pub. L. No. 97-221, 96 Stat. 227 (codified as amended at 5 U.S.C. §§ 6120 *et seq.*). In this new statute, Congress reenacted without change the prior definition of a compressed schedule. 5 U.S.C. § 6121(5)(B). Congress also amended the Act's definition of "part-time career employment" to state that it includes part-time employment of "32 to 64 hours during a biweekly pay period in the case of a flexible or compressed schedule under subchapter II of chapter 61 of this title." Pub. L. No. 97-221, § 3. This pair of definitions in the 1982 statute indicates that the enacting Congress did not believe that all part-time employees were required to work between 16 and 32 hours per week. The statute provides that agencies may permit a "part-time employee" to work "less than 80 hours" over a biweekly period, or less than 40 hours in a single workweek. 5 U.S.C. § 6121(5)(B); *see id.* § 6127(a) (authorizing agencies to "establish programs which use a 4-day workweek or other compressed schedule"). At the same time, it provides that agencies may permit a "part-time *career* employ[ee]" to work only "32 to 64 hours" over a biweekly period, or 16 to 32 hours in a single workweek. *Id.* § 3401(2) (emphasis added). If Congress believed that all part-time employees were part-time career employees, then these definitions should have been the same—all such employees should have been permitted to work only 32 to 64 hours in a biweekly period. This statute thus appears to reflect Congress's belief that, subsequent to the Act, agencies could continue to employ part-time employees who worked more than 32 hours per week. The fact that Congress "seems clearly to have contemplated" such conduct is "entitled to significant weight" in interpreting the Act. *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 595–96 (1980); *see Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) (describing circumstances in which later-enacted laws may inform the interpretation of earlier provisions, including when there is "direct focus by Congress upon the meaning of the earlier enacted provisions").[9]

A second potentially relevant statute amended 5 U.S.C. § 6323, a provision granting "permanent or temporary indefinite" employees the right to accrue leave for military purposes "at the rate of 15 days per fiscal year." 5 U.S.C.

---

[9] OPM argues that this discrepancy is the result of "inartful drafting": It speculates that the "less than 80 hours" language is an "oversight" that Congress inadvertently included in this statute as a "remnant" of the 1978 flexible and compressed schedules statute. OPM Reply at 1–3. We do not think this theory is persuasive. Congress did not simply copy the text of the 1978 flexible and compressed schedules statute without accounting for the passage of the Act. On the contrary, it expressly amended the Act's definition of "part-time career employment" to specify the hours that constituted a compressed schedule for part-time career employees. Congress's failure to similarly amend the definition of "compressed schedule" for all part-time employees thus appears to have been a deliberate choice, not an oversight.

§ 6323(a)(1). In 1980, Congress added a new subsection to this provision stating that employees "employed on a part-time career employment basis" would accrue military leave at a rate prorated to the portion of the full workweek they work. Act of Oct. 10, 1980, Pub. L. No. 96-431, § 1, 94 Stat. 1850, 1850 (codified at 5 U.S.C. § 6323(a)(2)). OPM argues that this amendment supports its reading of the Act, presumably on the theory that—as with the Act's health benefits provision— it would be anomalous if this statute prorated leave for part-time career employees while entitling other part-time employees to full military leave. OPM Reply at 4. But we think this argument rests on a mistaken premise. Prior to the enactment of this statute, the Comptroller General had consistently interpreted section 6323 and its predecessor, 10 U.S.C. §§ 371–371a, to entitle part-time employees to *no* military leave. *See Matter of William P. Wisinger*, 59 Comp. Gen. 365, 365 (1980) (citing prior decisions and legislative history supporting this view). In 1980, Congress concluded that this longstanding interpretation ran "counter to the Federal Employees Part-time Career Employment Act" as applied to part-time career employees and therefore extended the military leave statute to part-time career employees on a prorated basis. H.R. Rep. No. 96-1128, at 3 (1980). At least against the legal backdrop as Congress understood it,[10] this statute thus granted part-time career employees a benefit to which other part-time employees would not be entitled—a result, as we have said, that is entirely consistent with the Act's structure and purpose. *See supra* Part II.C.3.a.

A third statute referencing the Act was enacted in 1991. That statute, the Department of Veterans Affairs Health-Care Personnel Act of 1991, Pub. L. No. 102-40, 105 Stat. 187, authorizes the Secretary of Veterans Affairs to make appointments to the Veterans Health Administration without regard to a number of civil service requirements. *Id.* § 401(b)(2) (codified at 38 U.S.C. §§ 7405(a), 7406(a)(1)); *id.* § 401(b)(3) (codified at 38 U.S.C. § 7425). As relevant here, the statute provides that the Act's provisions "pertaining to part-time career employment" do "not apply to [covered] part-time appointments." 38 U.S.C. § 7407(e). OPM argues that this exemption "demonstrat[es] that an exclusion was required to prevent" all part-time employees from being subject to the Act. OPM Reply at 4. But we do not think the statute supports such an inference. Congress often exempts classes of persons from requirements that apply to some but not all class members, including elsewhere in the Department of Veterans Affairs Health-Care Personnel Act itself. *See, e.g.*, 38 U.S.C. § 7425(a) (exempting all employees appointed pursuant to the statute from requirements applicable only to the Senior Executive Service). Indeed, many of the "part-time appointments" authorized by this statute are required to be "temporary," *id.* § 7405(d), (g)(1), and so would not

---

[10] We express no view on whether the Comptroller General's decisions are correct or whether part-time employees who fall outside the Act's definition are eligible for military leave under 5 U.S.C. § 6323(a).

be subject to the Act under any reading. *See* 5 U.S.C. § 3401(2) (stating that "'part-time career employment' . . . does not include employment on a temporary or intermittent basis"). Hence, this statute too is fully consistent with the view that the Act did not eliminate part-time employment outside of its definition of part-time career employment.

For these reasons, we think that the statutes enacted subsequent to the Act support the first reading of the statute. The Federal Employees Flexible and Compressed Work Schedules Act seems clearly to contemplate the existence of part-time employees who do not work between 16 and 32 hours per week, whereas the other two statutes we have considered are equally consistent with either the first or second reading of the Act. The context of the Act as a whole thus bolsters the conclusion that it does not prohibit part-time employment that falls outside its definition.

* * * * *

In sum, several significant considerations support the conclusion that the Act does not limit agencies' preexisting authority to schedule part-time employees to work more than 32 hours per week. The Act's plain text and stated purpose do not purport to limit agencies' preexisting authority; its principal provisions would work as Congress intended if agencies retained that authority; and a contrary conclusion would lead to improbable results and undermine a later-enacted statute. In contrast, a conclusion that the Act prohibits all part-time employment of more than 32 hours per week would find support only in potential inferences drawn from the Act's ancillary benefits provisions and in ambiguous statements contained in the Act's legislative history. Accordingly, we think that the Act is best read not to limit agencies' preexisting authority to hire part-time employees and to schedule them for regular workweeks of 33 to 39 hours.

## III.

For the foregoing reasons, we conclude that the statutes governing federal employment permit part-time schedules of 33 to 39 hours a week. As noted above, we do not address whether OPM has authority, independent of the Act, to prohibit agencies from offering such schedules or whether agencies may elect (or require their components) not to offer such employment. Nor do we address what administrative steps, if any, would be required before CRT could begin authorizing part-time employees to work those schedules.

BRIAN M. BOYNTON
*Deputy Assistant Attorney General*
*Office of Legal Counsel*